ADVOCATES FOR FAITH & FREEDOM
Robert H. Tyler (SBN 179572)
btyler@faith-freedom.com
Julianne Fleischer (SBN 337006)
jfleischer@faith-freedom.com
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 304-7583

SIRI & GLIMSTAD LLP
Aaron Siri (*pro hac vice filed concurrently*)
aaron@sirillp.com
Marina Resciniti (*pro hac vice filed concurrently*)
mresciniti@sirillp.com
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: 888-747-4529

SIRI & GLIMSTAD LLP
Erin Bello (SBN 270783)
ebello@sirillp.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: 888-747-4529

*Attorneys for Plaintiffs*

1

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| KATHLEEN MULLIGAN and ANDREW PARKE,<br><br>                     Plaintiffs,<br><br>  v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT; PALISADES CHARTER HIGH SCHOOL; ALBERTO M. CARAVLHO, in his official capacity as Superintendent of Los Angeles Unified School District; SCOTT M. SCHMERELSON, in his official capacity as Board Member of Los Angeles Unified School District; NICK MELVOIN, in his official capacity as Board Member of Los Angeles Unified School District; KELLY GONEZ, in her official capacity as Board Member of Los Angeles Unified School District; ROCIO RIVAS, in his official capacity as Board Member of Los Angeles Unified School District; SHERLETT HENDY NEWBILL, in her official capacity as Board Member of Los Angeles Unified School District; KARLA GRIEGO, in her official capacity as Board Member of Los Angeles Unified School District; TANYA ORTIZ FRANKLIN, in her official capacity as Board Member of Los Angeles Unified School District, JOSEPH RINGLEHAN, in his individual capacity as private citizen,<br><br>                     Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

1

Plaintiffs Kathleen Mulligan and Andrew Parke ("**Plaintiffs**"), by and through their attorneys, file this Complaint against defendants Los Angeles Unified School District; Palisades Charter High School; Alberto M. Caravlho, in his official capacity as current Superintendent of the Los Angeles Unified School District; and Scott M. Schmerelson, Nick Melvoin, Kelly Gonez, Rocio Rivas, Sherlett Hendy Newbill, Karla Griego, Tanya Ortiz Franklin in their official capacities as Board Members for the Los Angeles Unified School District Board of Education, and Joseph Ringlehan, in his individual capacity as private citizen (collectively, "**Defendants**"), and allege the following:

## INTRODUCTION

1.  Dylan Parke was the only child of Plaintiffs Kathleen Mulligan and Andrew Parke—a bright and sensitive teenager who was deeply loved. During high school, Dylan battled with serious depression and other mental health challenges. His parents saw the signs and responded as any caring and devoted parents would—they sought private professional help by arranging therapy and by pursuing an evaluation for autism spectrum disorder.

2.  While Dylan's parents were actively treating their son, employees and agents of Palisades Charter High School and the Los Angeles Unified School District school implemented policies and undertook actions that were contradictory and damaging to their efforts without parental notice, consent, or involvement, despite Dylan's status as a minor. These harmful actions by employees and agents of Palisades Charter High School and Los Angeles Unified School District included referring Dylan to a counselor not employed by Palisades Charter High School without notifying Plaintiffs or seeking their consent or involvement.

3.  These policies and practices promoted the intentional withholding of material information from parents regarding their child's gender identity in furtherance of gender-affirming care. Under LAUSD's "Gender Identity and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

Students—Ensuring Equity and Nondiscrimination" bulletin, school personnel were permitted to treat a minor child's asserted gender identity as determinative, affirm a social transition at school, and withhold or limit disclosure to parents—even where a child's parents were actively involved, supportive, and already seeking mental-health care for their child.

4.    Gender-affirming care is recognized as a supportive form of healthcare, which may consist of medical, surgical, mental health and non-medical services, like adopting an individual's new name and pronouns.[1]

5.    When Dylan was a sophomore during the 2019-2020 school year, he disclosed to school staff that he was "coming out publicly as transgender," asked to be called "Aria," and requested to be referred to by "she/her" pronouns. Despite Dylan's mental health struggles and his parents' proactive steps to secure professional mental health treatment, school personnel engaged in gender affirming care to facilitate Dylan's social gender transition at school without parental knowledge, involvement, or consent.

6.    Rather than consulting or even notifying his parents, school staff treated Dylan's gender declaration as an absolute directive and affirmed and reinforced it enthusiastically and with praise and support. They connected Dylan with individuals who were not school employees and provided resources unaffiliated with the school. They even explicitly told Dylan that he did not need his parents' permission and instructed Dylan's teachers to address him by his new name and pronouns—all while deliberately withholding this information from his parents.

7.    When Dylan's parents learned that Dylan came out as transgender and changed his pronouns, they were concerned about his underlying mental health conditions and vulnerability to peer influence, prompting Dylan's mother, Plaintiff

---

[1] https://opa.hhs.gov/sites/default/files/2023-08/gender-affirming-care-young-people.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

Kathleen Mulligan, to contact school personnel with concern that Dylan had gotten swept up into peer pressure to embrace a transgender identity as a means of acceptance. Ms. Mulligan knew her son was struggling to fit in and asked for the school's input. Despite Ms. Mulligan's deep concern for her son's wellbeing and full awareness of her son's social transition, her email went unanswered.

8.    Instead of contacting Dylan's parents and working with them to ensure that the wholistic needs of Dylan were met, the school acted in a manner contrary to the efforts of Plaintiffs to protect their child and actively took steps to facilitate the separation of Dylan from his family.

9.    On March 1, 2024, Dylan tragically died by suicide. He was nineteen years old.

10.    Dylan's story is a cautionary tale of what can happen when the Constitutional rights of parents to direct the care, custody, and upbringing of their children are infringed upon by state actors. Consistent with those rights, Dylan's parents were entitled to receive truthful and material information from the school about Dylan's mental health and wellbeing so they could make informed and prompt decisions regarding his care with the mental health provider they, as parents, deemed in Dylan's best interests. Trampling on Plaintiffs' parental rights, Defendants implemented and enforced a policy excluding Plaintiffs from critical medical decisions concerning their son, without any findings of parental unfitness, abuse, or neglect.

11.    The State may not insert itself into the parent-child relationship under the guise of "support" and then avoid accountability when their policies and practices contribute to the declining mental health, well-being and ultimate death of a child. Consequently, Plaintiffs bring this action to hold Defendants accountable for policies and practices that violated their constitutional rights, fractured their family, inflicted devastating harm, and resulted in the loss of Dylan's life.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

**JURISDICTION**

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a), as the claims arise under the Constitution of the United States, specifically the Fourteenth Amendment, and 42 U.S.C. § 1983.

13.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution. The state law claims arise out of the same nucleus of operative facts as Plaintiffs' federal constitutional claims and would ordinarily be expected to be tried in one judicial proceeding.

14.     Venue is proper in the Central District of California pursuant to 28 U.S. Code § 1391(b), as all Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred within this district.

15.     An actual controversy exists between the parties involving significant constitutional issues, and Plaintiffs have suffered a concrete injury due to Defendants' actions. Specifically, Plaintiffs allege that Defendants' policies, and the procedures, directions and/or actions taken in connection therewith, violate the U.S. Constitution and have infringed and continue to infringe upon Plaintiffs' parental rights.

**PARTIES**

16.     Plaintiffs Kathleen Mulligan and Andrew Parke are adult individuals who reside in Los Angeles County, California.

17.     Plaintiffs' biological son and only child, Dylan Parke, was a student at Palisades Charter High School from the fall of 2018 through his graduation in June 2022.

4

18.    Defendant Los Angeles Unified School District ("**LAUSD**") is the second-largest district, is a large charter school authorizer, and oversees a significant number of charter school students.[2]

19.    LAUSD's administrative headquarters is located at 333 South Beaudry Avenue, Los Angeles, CA 90017.[3]

20.    Palisades Charter High School ("**PCHS**") is a charter high school within LAUSD[4] that was approved as a charter school by LAUSD in 1993.[5] Its campus is located at 15777 Bowdoin Street, Pacific Palisades, CA 90272.[6]

21.    Although PCHS operates as a California non-profit public benefit corporation,[7] LAUSD maintains significant ties to PCHS, including but not limited to:

    a.    ownership of the buildings and facilities on PCHS's campus;[8]

    b.    oversight of PCHS;[9]

---

[2] LAUSD, Fingertip Facts (2025-26), 170225-cc3e26de-f440-4470-9e85-486022db3fa6.pdf.

[3] LAUSD, LAUSD Headquarters, https://www.lausd.org/headquarters (last visited Feb. 25, 2026).

[4] Palisades Charter High School, *Welcome*, https://palihigh.org/apps/pages/index.jsp?uREC_ID=410707&type=d (last visited Feb. 25, 2026).

[5] PCHS School Profile, https://www.palihigh.org/pdfs/PCHS%20School%20Profile%202020-2021_Updated%209_16.pdf.

[6] Palisades Charter High School, https://www.palihigh.org/ (last visited February 25, 2026).

[7] PCHS School Profile, https://www.palihigh.org/pdfs/PCHS%20School%20Profile%202020-2021_Updated%209_16.pdf.

[8] Circling the News, LAUSD Explains Next Steps to Replace Buildings at 3 Schools, (Mar. 30, 2025), https://www.circlingthenews.com/lausd-explain-next-steps-to-replace-buildings-at-3-schools/.

[9] LAUSD, *About Charter School Authorization*, https://charter.lausd.org/apps/pages/index.jsp?uREC_ID=4425132&type=d&pREC_ID=2660940 (last visited Feb. 25,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

c.    regular consultation with PCHS parents, legal guardians, and teachers regarding PCHS educational programs;[10]

d.    identification of at least one staff member as the contact person for PCHS;[11]

e.    annual PCHS visits;[12]

f.    monitoring/ensuring PCHS compliance with all reports required by law;[13]

g.    monitoring the fiscal condition of PCHS;[14] and

h.    notifying the California Department of Education of PCHS's renewal status, if its charter is revoked, or if it ceases to operate for any reason.[15]

22.    PCHS officials were responsible for adopting and implementing policies that caused the violations described throughout this Complaint, including

---

2026).

[10] LAUSD, *About Charter School Authorization*, https://charter.lausd.org/apps/pages/index.jsp?uREC_ID=4425132&type=d&pREC_ID=2660940 (last visited Feb. 25, 2026).

[11] LAUSD, *About Charter School Oversight*, https://charter.lausd.org/apps/pages/index.jsp?uREC_ID=4425132&type=d&pREC_ID=2660941    (last visited Feb. 25, 2026).

[12] LAUSD, *About Charter School Oversight*, https://charter.lausd.org/apps/pages/index.jsp?uREC_ID=4425132&type=d&pREC_ID=2660941    (last visited Feb. 25, 2025).

[13] LAUSD, *About Charter School Oversight*, https://charter.lausd.org/apps/pages/index.jsp?uREC_ID=4425132&type=d&pREC_ID=2660941    (last visited Feb. 25, 2026).

[14] LAUSD, *About Charter School Oversight*, https://charter.lausd.org/apps/pages/index.jsp?uREC_ID=4425132&type=d&pREC_ID=2660941    (last visited Feb. 25, 2026).

[15] LAUSD, *About Charter School Oversight*, https://charter.lausd.org/apps/pages/index.jsp?uREC_ID=4425132&type=d&pREC_ID=2660941    (last visited Feb. 25, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

policies concealing gender-affirming care for students at PCHS from parents like Plaintiffs. These policies and PCHS's actions related to enforcing these policies caused the violations described in this Complaint.

23.    Defendants Scott M. Schmerelson, Nick Melvoin, Kelly Gonez, Rocio Rivera, Sherlett Hendy Newbill, Karla Griego, and Tanya Ortiz Franklin are current Board Members of the Board of Education for LAUSD (collectively referred to herein as "**LAUSD Board Defendants**").

24.    Upon information and belief, LAUSD Board Defendants were and are responsible for adopting policies implemented and enforced throughout LAUSD, including policies concealing gender-affirming care for students at PCHS from parents like Plaintiffs. These policies and LAUSD Board Defendants' actions related to enforcing these policies caused the violations described in this Complaint.

25.    Defendant Alberto M. Caravlho,[16] ("**Defendant Caravlho**") served as Superintendent of LAUSD during Dylan's tenure at PCHS. Upon information and belief, Defendant Caravlho was responsible for executing and implementing policies adopted by the LAUSD Board Defendants, including policies concealing gender-affirming care by LAUSD and PCHS. These policies and Defendant Caravlho's actions related to enforcing these policies caused the violations described in this Complaint, and continue to violate the rights of parents currently enrolled in LAUSD.

26.    Upon belief, Defendant Ringlehan was employed by LAUSD as a psychiatric social worker during the time Dylan attended PCHS. Alternatively, Defendant Ringlehan was not employed by LAUSD during the operative time and caused the violations alleged in this Complaint while a private citizen. Defendant Ringlehan provided mental health services to Dylan, including services related to gender-affirming care, without the knowledge or consent of Plaintiffs. The precise

---

[16] February 2022 through the present.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

circumstances under which Defendant Ringlehan came to treat Dylan, his relationship to PCHS, and the full scope of his treatment are matters within Defendants' exclusive knowledge and control and will be established through discovery. Plaintiffs only learned of the basis of Defendant Ringlehan's violations in June 2025 (*See* Exhibit 3 below).

**FACTUAL ALLEGATIONS**

***Overview***

27.    Over a century ago, the U.S. Supreme Court issued a landmark ruling in *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925), holding that parents have a fundamental right to direct the education and upbringing of their children. This decision enshrined the timeless truth that parents have an inherent authority to nurture and shape their children's upbringing, free from government control. The *Pierce* Court noted that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 U.S. at 535.

28.    Since *Pierce*, the Supreme Court has continuously recognized the fundamental right of parents to make child rearing decisions. As the Supreme Court in *Wisconsin v. Yoder* aptly recognized, "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." 406 U.S. 205, 232 (1972).

29.    Courts, including the Ninth Circuit, have expanded upon the *Pierce* decision and have recognized a fundamental right to family association, which "includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state," as well as the right of parents to the companionship and society of their children,

8

which is comprised of both a custodial interest (where the child is a minor) and companionship and society (before and after the child reaches the age of majority) (all aforementioned rights are collectively referred to herein as "**Parental Rights**"). *Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 1999).

30.    Here, Defendants implemented and maintain a policy and practice of withholding material information from parents whenever a student expressed a desire to socially transition their gender at school (the "**Secrecy Policy**"). Under this policy, school personnel concealed the student's asserted name, pronouns, gender identity, related counseling, mental health concerns, and other transition-related matters from parents, and treated the student's own assertions as sufficient to trigger the policy, with no objective criteria, parental notification, or verification required. Attached as **Exhibit 1** is a true and correct copy of LAUSD's written policy and related guidance reflecting the Secrecy Policy described herein.

31.    Defendants' actions in Dylan's case went well beyond simply offering routine educational accommodations or support within the school environment. They actively facilitated Dylan's access to outside resources and services—without Plaintiffs' knowledge or consent.

32.    Socially transitioning at school is not a minor or incidental matter—its effects extend well beyond school. When school officials treat a child's asserted gender identity as the basis to implement a plan of secrecy from parents—including renaming the child, using new pronouns, and providing related interventions and support—these steps address deep and fundamental parts of the child's life. They directly impact: the child's core identity, mental health, emotional stability, and relationships within the family.

33.    Defendants' policy and conduct in Dylan's case went far beyond everyday classroom management or routine accommodations. Instead, they directly influenced Dylan's overall well-being and day-to-day living situation.

34.     Plaintiffs have the right to direct the care, custody, and upbringing of their minor child, including the right to receive information necessary to protect Dylan's welfare and obtain appropriate care. By intentionally concealing critical information and substituting Defendants' judgment for Plaintiffs' judgment regarding an issue as fundamental as Dylan's gender identity, Defendants interfered with Plaintiffs' Parental Rights, severely damaged, and fundamentally altered the parent-child relationship without consent.

35.     When Defendants established and implemented the Secrecy Policy, Dylan was a minor. Defendants exploited Dylan's age and vulnerability by treating him as capable of making life-altering decisions, in secret, while excluding the very adults legally and morally responsible for his safety and care. Defendants' conduct deprived Plaintiffs, as Dylan's parents, of the opportunity to intervene when necessary, support Dylan, and secure appropriate resources for the challenges Dylan faced.

36.     As a direct and foreseeable result of Defendants' Secrecy Policy and actions toward Dylan, Plaintiffs suffered the loss of parental involvement and the ability to protect and care for their child, along with severe emotional distress and related damages.

37.     Specifically, Defendants violated Plaintiffs' substantive due process rights under the Fourteenth Amendment to the United States Constitution by subverting Plaintiffs' decision-making authority and usurping their Parental Rights through the secret provision of gender-affirming care to Plaintiffs' minor son, Dylan.

38.     Defendants' actions exceeded the lawful scope of the school's authority and intruded into matters constitutionally reserved to parents. Examples of Defendants' unlawful conduct include, but are not limited to:

a.     Affording school personnel discretion to provide Plaintiffs' minor son with transgender housing resources under the guise of gender-affirming

10

care, thereby facilitating or encouraging his separation from his family; and

b.   Providing or facilitating mental health services for Plaintiffs' son in furtherance of gender-affirming care, without first consulting with Plaintiffs to ensure informed consent or consistency with existing, parent-directed mental health treatment.

39.   Not only did Defendants violate Plaintiffs' substantive due process rights under the Fourteenth Amendment, Defendants violated Plaintiffs' procedural due process rights.

40.   California law, like that of many other states, safeguards the legal and custodial rights of a parent absent a judicial finding that the parent poses a substantial risk of harm to the child. *See*, e.g. Cal. Welf. & Inst. Code § 300, *et seq*. Defendants' policy and the execution thereof bypass the legal threshold requiring a preponderance of evidence that parents have not and cannot act in the best interest of their child, warranting removal of some or all of their Parental Rights. By circumventing the procedural protections required by law, Defendants unlawfully usurped Plaintiffs' parental authority and acted unilaterally in matters reserved to the family. In doing so, Defendants unconstitutionally assumed a parental role *in loco parentis* and imposed gender-affirming interventions on Plaintiffs' minor son without providing notice, obtaining judicial authorization, or seeking parental consent, in direct violation of the Fourteenth Amendment.[17]

**_Defendants Adopt a Policy to Conceal and Keep Secret Gender-Affirming Care_**

41.   On May 17, 2019, LAUSD issued the Secrecy Policy in a district-wide

---

[17] Cal. Welf. & Inst. Code § 300(b)(3) affords deference to parents' medical treatment or non-treatment of their minor children. Recent California litigation confirms that secrecy-based school practices that withhold material information from parents and bypass established notice and participation safeguards raise serious procedural due process concerns.

11

policy bulletin titled Gender Identity and Students—Ensuring Equity and Nondiscrimination, No. BUL-6224.2. *See* Exhibit 1.

42.    The Secrecy Policy's stated purpose was to "advise District staff regarding best practices relating to recognition of each student's gender identity consistent with the goals of reducing stigmatization and ensuring access [to the District's educational programs and activities] for students." The Secrecy Policy leaves to the complete discretion of school personnel the decision of whether to disclose or conceal a "student's gender identity or expression" to the student's parents and cautions that "school personnel should be aware that the student may not have disclosed their gender identify to their parents."

43.    Upon information and belief, this Secrecy Policy was in effect and implemented by PCHS during the majority of Dylan's tenure at PCHS.

44.    Relevant provisions of the Secrecy Policy include the following:

a.    Section I, I defines, "[t]ransition" as "[t]he unique process in which one goes from living and identifying as one gender to live in alignment with one or more dimensions of the gender with which one identifies. Gender transition can occur at any age and can include social, medical, and/or legal transition."

b.    Section II asserts, "The school shall accept the gender identity that each student asserts. There are no medical or mental health diagnoses or treatment thresholds that students must meet in order to have their gender identity recognized and respected" and "school shall customize support to optimize each student's access according to their gender identity."

c.    Section II, A asserts, "[w]hen communicating with a parent, legal guardian, or educational rights holder ("parent"), school personnel should be aware that the student may not have disclosed their gender

12

identity to their parents. When school personnel find it important to discuss a student's gender identity or expression with parents…school personnel should consult and work closely with the student to assess the degree to which, if any, the parent is aware of the student's gender identity or expression and its support of the student, and school personnel shall take into consideration the safety, health and well-being of the **student in deciding whether to disclose the student's gender identity or expression to the parents**." (Emphasis added).

d.  Section C, 1 states, "The District shall permit students to use the name and gender with which they identify on school records" including but not limited to "identification badges, classroom and homeroom rosters, certificates, programs, announcements, office summons and communications, team and academic rosters, diplomas, newspapers, newsletters, yearbooks and other site-generated records."

e.  Section D, 1 asserts, "[s]tudents shall be addressed by the name and pronoun that corresponds to their gender identity asserted at school without obtaining a court order."

f.  Section D, 2 states, "[s]tudents shall be known by their name and gender of identity. However, there may be situations (e.g., communications with the family…) where it may be necessary and recommended for staff to be informed of the student's legal name and gender. In these situations, staff should prioritize safety, confidentiality and respect of the student in a manner consistent with the law."

g.  Section D, 4 states, "[e]very effort should be made to use names and pronouns consistent with a student's gender identity. While inadvertent slips or honest mistakes may occur, the intentional and persistent refusal to respect a student's gender identity is a violation of District

13

1    policy and may constitute discrimination under state law."

2    45.    The Purpose section of the Secrecy Policy did "not anticipate every

3    situation that might occur with respect to gender identity and expression and

4    students" and that "[t]he needs of each student are unique"—granting district and

5    school personnel broad discretion to conceal gender-affirming conduct.

6    46.    Since the implementation of the Secrecy Policy, Defendants have

7    doubled down on its key provisions. On or about August 26, 2024, LAUSD issued

8    a document titled Gender Identity and Students—Ensuring Equity and

9    Nondiscrimination ("**New Secrecy Policy**"). A true and correct copy of the New

10    Secrecy Policy is attached hereto as **Exhibit 2**.

11    47.    The LAUSD Defendants are responsible for adopting and

12    implementing the New Secrecy Policy and are in fact implementing and enforcing

13    the New Secrecy Policy. Absent injunctive relief, they will continue to violate the

14    law in the same manner they have violated Plaintiffs rights. And the violations herein

15    alleged as to Plaintiffs are capable or repetition yet will evade judicial review.

16    48.    The New Secrecy Policy replaces the Secrecy Policy but maintains the

17    same purpose and key provisions allowing for the continued deprivation of parental

18    rights through secrecy and exclusion of parents with students currently enrolled in

19    LAUSD.

20    ### *Defendants Provide Gender-Affirming Care*
21    ### *to Dylan Without Plaintiffs' Consent*

22    49.    On May 6, 2020, Dylan, a minor child and sophomore, messaged his

23    school Counselor, Elva Pouya ("**Ms. Pouya**"), through Schoology,[18] advising her

24    that he was "currently in the middle of coming out publicly as transgender." He

25    further advised that his new name was "Aria," that his pronouns were "she/her," and

26

27    [18] Schoology is a cloud-based learning management system used by schools,
including PCHS.

28

14

1    that he wanted to change his name in Schoology.

2    50.    Upon information and belief, Ms. Pouya is, and was at all relevant

3    times, an employee of Defendant PCHS.

4    51.    Consistent with the Secrecy Policy, Ms. Pouya received Dylan's

5    disclosure not as an opportunity to engage his parents in coordinated care, but as a

6    directive to affirm his newly asserted identity in isolation, regardless of whether

7    Plaintiffs' parental decisions in this regard were contradicted. She immediately

8    praised his "courage and honesty," expressed that she was both "very proud" of and

9    happy for him.

10    52.    Upon information and belief, Ms. Pouya began treating Dylan's

11    declaration as self-determinative—without any outreach to Plaintiffs, consultation

12    with Dylan's existing clinicians, or assessment of his underlying mental health

13    conditions. By responding in this manner consistent with the Secrecy Policy's

14    discretion and confidentiality directives, Ms. Pouya proceeded without parent

15    notification and advanced gender-affirming practices that conflicted directly with

16    Plaintiffs' established treatment plan for their minor son.

17    53.    On May 12, 2020, without ever reaching out to Plaintiffs or including

18    them in any communications, Ms. Pouya advised Dylan, through Schoology, that

19    she was connected with an individual named Joe Ringlehan ("**Defendant**

20    **Ringlehan**"), who she noted ran the Pali Transgender Group (a student club at

21    PCHS), and explained that he had some resources and suggestions for Dylan. She

22    also explained that Mr. Ringlehan was pushing for Ms. Pouya to ask Dylan if it was

23    okay for him to contact Dylan.

24    54.    Ms. Pouya's May 12, 2020 communication constituted gender-

25    affirming care as it provided Dylan with additional gender-affirming interventions—

26    without notice to or consent from Plaintiffs (his parents). Rather than contacting

27    Plaintiffs to coordinate with Dylan's existing treatment providers, Ms. Pouya,

28

pursuant to the Secrecy Policy, facilitated Dylan's contact and referral to Defendant Ringlehan and other gender-affirming resources outside Dylan's existing care team, directly conflicting with Plaintiffs' efforts to ensure consistent and medically informed care for their vulnerable son. By doing so, Defendants advanced gender-affirming practices in contravention of parental authority and in violation of Plaintiffs' constitutionally protected rights.

55.     Defendant Ringlehan was not and is not an employee of PCHS. Plaintiffs first learned in the summer of 2025 that Defendant Ringlehan had likely violated their constitutional rights through shielding material information from Plaintiffs through records produced in response to a California Public Records Act request. Attached as **Exhibit 3** is a true and correct copy of the document produced by PCHS confirming Defendant Ringlehan was not an employee of PCHS.

56.     Upon information and belief, Defendant Ringlehan was a psychiatric social worker working for LAUSD, or, as a private citizen, working in coordination with LAUSD during the operative timeframe.

57.     Upon information and belief, Defendant Ringlehan contacted Dylan without Plaintiffs' consent and provided gender-affirming care in violation of Plaintiffs' Parental Rights.

58.     On May 20, 2020, after Defendant Ringlehan's initial contact with Dylan, Defendant Ringlehan messaged Dylan through Schoology requesting Dylan's availability to meet with him and Ms. Pouya about his name change. During this exchange, Mr. Ringlehan stated he would "briefly go over what we talked about…*things like you don't need your parent's permission,*" (emphasis added), in furtherance of providing gender-affirming care. Plaintiffs were unaware of the extent Defendant Ringlehan's decisions to coordinate Dylans gender affirming care with the LAUSD Defendants until June of 2025.

59.     Mr. Ringlehan's decision to unilaterally exclude Plaintiffs from critical

parental decisions extended far beyond the school environment. It eroded Plaintiffs' fundamental parental rights to direct and oversee Dylan's upbringing and soured the familial relationship, straining familial bonds and fostering emotional distress. This was not only painful for Plaintiffs but emotionally damaging for Dylan as he grew increasingly distant and isolated himself at home after Defendant Ringlehan's advice, compounding his social insecurities and sense of belonging.

60.    This message is another example of gender-affirming care provided to Dylan in violation of Plaintiffs' Parental Rights.

61.    Consistent with the Secrecy Policy, Ms. Pouya and Defendant Ringlehan did not contact Plaintiffs at any point regarding the gender-affirming care they provided to Dylan. Nor did Defendants offer any explanation as to why they believed excluding Plaintiffs from these discussions served Dylan's best interests.

62.    Upon information and belief, on or around August 2020, Ms. Pouya directed Dylan's teachers to begin using his new name and pronouns without notifying or obtaining consent from Plaintiffs. This directive constituted an additional act of gender-affirming care implemented in secret, contrary to Plaintiffs' explicit right to direct their son's upbringing and medical treatment.

63.    By unilaterally altering how Dylan was identified in the school environment, Defendants further undermined the parental role, fostering confusion and disconnection within the family while concealing actions that directly affected Dylan's emotional and psychological well-being in direct violation of Plaintiffs' Parental Rights.

64.    Upon information and belief, Ms. Pouya also provided Dylan with additional mental health resources and services related to his newly asserted transgender identity without consulting Plaintiffs. These actions, undertaken pursuant to the Secrecy Policy, deprived Plaintiffs of the opportunity to ensure that any counseling or support aligned with Dylan's established treatment plan. By

17

excluding Plaintiffs from these critical decisions, Defendants disregarded both parental consent requirements and the duty to coordinate care in the child's best interest, in direct violation of Plaintiffs' Parental Rights.

65.    On August 18, 2020, deeply concerned with her son's well-being and completely unaware of Defendant Ringlehan and Ms. Pouya's gender-affirming care, Plaintiff Mulligan e-mailed Ms. Pouya. She explained she was aware of Dylan's interest in transitioning socially and that he had begun changing his name and pronouns. She advised that she was not transphobic but was a concerned mother.

66.    Plaintiff Mulligan informed Ms. Pouya of the strong belief that Dylan's transition stemmed from peer pressure and expressed concern that it had a social contagion element. Plaintiff Mulligan also told Ms. Pouya of her belief that Dylan had autism spectrum disorder. Ms. Mulligan's belief was based on longstanding developmental traits she had observed throughout his childhood and adolescence, including general quirkiness, limited eye contact, intense and persistent subject matter fixations, difficulty engaging in reciprocal social conversation, and other social communication patterns that, in her view, were consistent with characteristics commonly associated with autism spectrum disorder.

67.    Critically, Ms. Mulligan explained that she was concerned about her son's future and emotional well-being, noting that Dylan appeared easily influenced and preoccupied with how others perceived him. She expressed her belief that Dylan was particularly vulnerable to social contagion related to gender identity, as his "trans identity" appeared to provide him with a sense of belonging and validation from peers who were being celebrated for similar disclosures. This concern was heightened by Dylan's social challenges, including a changing peer group and not being selected for the baseball team, which left him feeling isolated and struggling to regain a sense of identity.

68.    Ms. Mulligan closed her email to Ms. Pouya explaining that "[i]f I

1  thought Dylan was really trans I would have a different mind set but I know my son

2  better than anyone and I know he is struggling and I want what is best for him. He

3  has so much potential and I worry about his mental health."

4       69.    Defendants' Secrecy Policy, which required PCHS staff, to refer to

5  Dylan by his preferred pronoun and by the name "Aria" was contradictory to

6  Plaintiffs' parenting strategy for their vulnerable child and conflicted with the legal

7  and medical determinations Plaintiffs decided for their child.

8       70.    Despite Ms. Mulligan's direct outreach and evident concern for her

9  son's safety and mental health, her email went unanswered.

10       71.    Neither Ms. Pouya nor any other employee, agent, or representative of

11  PCHS or LAUSD responded to her inquiry. This silence reflected Defendants'

12  adherence to the Secrecy Policy, which prioritized concealing gender-affirming

13  activities from parents over engaging them in decisions affecting their child's

14  welfare. By ignoring Ms. Mulligan's plea for communication, Defendants further

15  violated Plaintiffs' Parental Rights and denied them the opportunity to participate in

16  the care of their minor son.

17       72.    On October 12th, while Dylan was still a minor, he received a

18  Schoology message from PCHS's 504 Coordinator, Grant Smith ("**Mr. Smith**"),

19  who upon information and belief is and was an employee of LAUSD.

20       73.    This message forwarded Dylan a link ("**Link**") to the LA LGBTQ

21  Center's ("**LGBTQ Center**") youth transitional housing webpage. This message

22  only included the Link and is believed to have been provided in response to a

23  previous in person or written communication between Dylan and Mr. Smith.

24       74.    The transmission of the Link was made in furtherance of providing

25  gender-affirming care to Dylan without notice to his parents. By directing Dylan to

26  transitional housing resources without notice to or consultation with Plaintiffs,

27  Defendants intruded into the family relationship and acted in violation of Plaintiffs'

28

constitutional right to direct their child's care and upbringing.

75.    The provision of the Link also served to weaken and sever the parent-child relationship in direct contravention of Plaintiffs' Parental Rights. Defendants' secrecy and gender-affirming interventions drove Dylan further away from his parents and caused the ultimate constitutional violation – the death of Plaintiffs child on March 1, 2024.

76.    Defendants' conduct materially and foreseeably altered the parent-child relationship. Prior to Defendants' involvement, Dylan shared a close, affectionate, and communicative relationship with his parents. As school personnel increasingly engaged Dylan in transition-related discussions and interventions without Plaintiffs' knowledge, Dylan became withdrawn, oppositional, and distrustful of his parents. He resisted their guidance, questioned their motives, and distanced himself emotionally and socially from the family. Plaintiffs, in turn, were left confused and destabilized, unable to understand the source of the abrupt change while being excluded from the very communications shaping it.

77.    The secrecy surrounding these interactions created tension, conflict, and a persistent atmosphere in their home in which Plaintiffs felt they were "walking on eggshells," fearful that any parental inquiry would further alienate their child. The result was not merely disagreement, but a progressive erosion of trust, communication, and familial cohesion—harm that was both foreseeable and entirely preventable had Defendants honored Plaintiffs' right to be informed and involved. Moreover, this conduct bore no relation to the Secrecy Policy's stated purpose of "reducing stigmatization and ensuring access [to the District's educational programs and activities] for students." Instead, it functioned as a foreseeable extension of gender-affirming care unrelated to any legitimate educational objective and without Plaintiffs' notification, involvement, or consent

78.    Plaintiffs were given no explanation or opportunity to question or

challenge the life-altering decisions, medical advice, and medical treatment administered and encouraged by Defendants. Defendants' actions demonstrated they presumed that it was in Dylan's best interest to distance himself from and sever his relationship with his parents. By excluding Plaintiffs from these determinations, Defendants once again disregarded parental authority and the procedural protections guaranteed under the Fourteenth Amendment.

79.    Upon information and belief, Defendants engaged in extensive written and in-person communications with Dylan in furtherance of providing gender-affirming care pursuant to the Secrecy Policy. These interactions occurred without Plaintiffs' knowledge or consent and continued both before and after Dylan reached the age of majority. Through this ongoing conduct, Defendants maintained their involvement in Dylan's transition and reinforced the exclusion of his parents from matters central to his identity, health, and well-being. The full scope of these communications, including the nature and frequency of Defendants' interactions with Dylan, will be revealed through discovery in this matter.

### *Defendants Publicly Provide Gender-Affirming Care*

80.    On March 25, 2022, at the end of his senior year of high school, Dylan turned eighteen (18).

81.    On May 26, 2022, PCHS had a Symphony Orchestra Concert, wherein Dylan was recognized by a PCHS employee before an audience as "Aria," in furtherance of Defendants' policies described throughout.[19]

82.    By affirming Dylan's gender identity during the concert—a public event attended by peers, parents, and community members—Defendants engaged in gender-affirming conduct without Plaintiffs' knowledge or consent. This action deprived Plaintiffs of their rightful place in their son's life and undermined the

---

[19] Vimeo, Pali Final Symphony Orchestra Concert, May 26, 2022, https://tinyurl.com/z3v7vxuz at 11:48.

companionship, society, and familial relationship they were entitled to enjoy. By publicly presenting Dylan as "Aria" before the school community, Defendants extended the Secrecy Policy into a public setting, disregarded Plaintiffs' express Parental Rights, and deepened the emotional distance created by their earlier concealment of Dylan's transition.

83. On June 9, 2022, Dylan graduated from PCHS. During the graduation ceremony, school officials publicly referred to Dylan as "Aria Parke,"[20] consistent with Defendants' policy to pursue gender affirming care in a manner inconsistent with Plaintiffs parental rights.

84. By affirming Dylan's transgender identity at this public ceremony and milestone occasion, Defendants once again engaged in gender-affirming conduct without Plaintiffs' knowledge or consent. This public presentation deprived Plaintiffs of the ability to participate in or even emotionally prepare for the event, disrupting the family's emotional connection and the shared significance of this milestone. By doing so, Defendants extended the Secrecy Policy to a ceremonial occasion, disregarding Plaintiffs' Parental Rights and deepening the harm caused by Defendants' prior concealment of Dylan's transition.

85. Upon information and belief, there are additional instances in which Defendants publicly engaged in and/or facilitated gender-affirming care without the knowledge or consent of Plaintiffs. These incidents further demonstrate a continuing pattern of exclusion and disregard for Plaintiffs' constitutionally protected Parental Rights, the full extent of which will be revealed through discovery in this matter.

### ***The Secrecy Policy and New Secrecy Policy Concealing Gender-Affirming Care From Parents are Unconstitutional***

86. The Secrecy Policy and New Secrecy Policy are unconstitutional. They

---

[20] Malia Jakus, PCHS Commencement Ceremony 2022, https://www.youtube.com/watch?v=A28vI8ltVH4&t=6869s at 1:54:30.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

lack objective criteria, procedural safeguards, or defined thresholds. They require no diagnosis, formal assessment, clinical referral, or parental notice. Instead, they can be triggered solely by a student's statement about changing name, pronouns, or gender presentation. This creates an open-ended, standardless framework that gives school personnel broad, subjective discretion to decide what "support" or "affirmation" to provide—and to do so secretly from parents.

87.    The Secrecy Policy and New Secrecy Policy also lack guardrails, foreseeably leading to escalating, harmful actions. Without limiting principles, staff were empowered to take steps that affected Dylan's life outside of school, mental health, and decision-making. For example, Mr. Smith provided Dylan with the Link—an outcome directly tied to the Secrecy Policy's design, which authorized secret social transitions without medical/mental health thresholds, parental involvement or defined limits on "support measures."

88.    Even if some supported measures for transgender students are permissible, the Secrecy Policy and New Secrecy Policy are facially unconstitutional. It is not narrowly tailored because it authorizes initiating and managing social transitions—and concealing them from parents—without basic safeguards like mental health screening, consideration of the child's history, referral to professionals, risk assessments, documentation, or parental notice/involvement before affirmative steps are taken.

89.    The absence of safeguards caused real harm in Dylan's case. Dylan had diagnosed depression and suspected autism spectrum disorder, yet the Secrecy Policy's unchecked discretion and default secrecy placed him on a school-directed path of affirmation and concealment without oversight. This increased his vulnerability, distress, and extended school involvement far beyond routine educational functions.

90.    The Secrecy Policy and New Secrecy Policy fail to show that secrecy

23

is necessary for any legitimate governmental interest. It assumes secrecy is appropriate whenever a student seeks social transition at school, without requiring individualized findings, assessments, documentation, diagnosis, or evidence that nondisclosure is needed in the specific case. Parental exclusion becomes the default rule, even though parents are typically the primary sources of emotional, medical, and psychological support.

91.     The Secrecy Policy isolated Dylan rather than helping him. It did not expand educational access or reduce stigma; instead, it cut him off from those best equipped to address his distress and mental health risks, depriving him of the stability parental involvement provides.

92.     The Secrecy Policy and New Secrecy Policy's approach to parental exclusion is overbroad and not narrowly tailored. While student safety matters, the Secrecy Policy and New Secrecy Policy provide no objective criteria or safeguards for when withholding information from parents is justified. It requires no formal assessment, clinical input, or individualized determination of specific risks (e.g., neglect, violence). Instead, it allows secrecy based on subjective judgment and generalized assumptions, making it routine rather than a limited exception.

93.     Importantly, no actual safety risk justified secrecy here. Plaintiffs loved and supported Dylan, and the staff knew he was at home and attending school regularly. A narrowly tailored policy would demand documented, case-specific evidence of concrete harm before excluding parents. By lacking thresholds or limits, the Secrecy Policy operated as a blanket rule of parental exclusion, untethered to individualized safety findings and therefore unconstitutional.

94.     The Secrecy Policy and New Secrecy Policy are blanket policies, and are not the least restrictive means to achieve any purported compelling interest (e.g., student mental health or gender affirmation). Schools can support students by affirming their gender identity while promptly notifying parents. This enables a

coordinated, holistic approach that respects parents' fundamental rights. Parents possess unique, irreplaceable knowledge of their child's medical, psychological, developmental and family history—which schools lack. Without it, schools cannot make fully informed decisions on the child's best interests and are not positioned to override parental authority. This alternative, advances student well-being more effectively than blanket secrecy, which risks familial conflict, overlooks co-occurring issues, and creates unnecessary "parallel lives" between home and school.

### *Defendants Were Aware That Transgender-Identifying Students Posed a Heightened Suicide Risk*

95.     Upon information and belief, on or about June 6, 2017, PCHS approved and implemented a Youth Suicide Prevention Policy ("**Suicide Policy**"), which emphasized parental involvement as a critical component of its suicide prevention, intervention, and postvention strategies. Attached as **Exhibit 4** are true and correct copies of LAUSD's policy documents and related guidance setting forth the District's suicide prevention, assessment, and intervention procedures.

96.     Importantly, the Suicide Policy identified transgender youths, of which Dylan identified, as being an "elevated risk for suicide."

97.     Where a student is identified as at-risk for suicide, the Suicide Policy requires that parents be contacted by designated school staff, as parents are recognized as partners in suicide prevention.

98.     Upon information and belief, Defendants did not extend these mandatory parental-notification protections to transgender students, instead treating the Secrecy Policy as superseding and displacing the Suicide Policy's express requirement that parents be contacted when a student is identified as at risk.

99.     Despite Defendants' purported belief that Dylan was transgender and therefore at a heightened risk of suicide, Defendants failed to notify Plaintiffs of this assessment and took active steps to conceal from Plaintiffs the gender-affirming

interventions being provided to their son. In doing so, Defendants disregarded established protocols requiring parental involvement when a student is identified as at-risk and undermined Plaintiffs' ability to ensure Dylan's safety and obtain appropriate mental health support.

100.   Further, instead of alerting Plaintiffs and coordinating care consistent with Dylan's private therapy, Defendants facilitated gender-affirming measures at school that conflicted with his ongoing treatment and parental guidance. These actions contravened the district's own suicide-prevention policy, which mandates parental communication and partnership in cases of identified risk, and further violated Plaintiffs' constitutional right to direct their child's medical and psychological care.

### ***Impact on Plaintiffs***

101.   The loss Plaintiffs have experienced as a consequence of Defendants' Policy cannot be put into words—it is every parents' nightmare. Every single day Plaintiffs wake up and their son—their only child—is gone. There are no more birthdays to celebrate, there is an empty seat at the Thanksgiving table, Plaintiffs will never see Dylan graduate from college, have a family, or watch him reach his full potential. Instead, Plaintiffs have suffered and will continue to suffer from the ongoing effects of Defendants' constitutional violations of their parental rights.

102.   Because of the Secrecy Policy, Defendants sowed seeds of distrust, isolating Dylan, and robbing Plaintiffs of their son during the remaining years of his childhood. This caused Plaintiffs so much pain—they missed their son, they were worried about what would happen to him, they were frustrated and were constantly searching for an answer on how to help.

103.   All of this pain caused Plaintiffs to withdraw from friends and extended family. It was difficult to discuss what they were experiencing, particularly given the sensitivity of the subject matter and the social scrutiny they perceived as parents

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

navigating a highly charged issue.

### *Permanent Injunctive Relief*

104.  Plaintiffs seek a permanent injunction enjoining Defendants from continuing to implement or enforce the New Secrecy Policy, which authorizes school personnel not to notify parents about a student's gender identity/transition. The continuation of this secretive gender-affirming conduct creates a real and imminent threat of ongoing and future violations of parental rights under the Fourteenth Amendment. As alleged herein, Defendants are aware—or deliberately indifferent to the fact—that students identifying as transgender face a heightened risk of suicide and severe mental health challenges, rendering parental involvement essential to monitor, support, and seek appropriate professional intervention for their children's well-being.

105.  Absent injunctive relief enjoining the New Secrecy Policy, Plaintiffs and other parents have no adequate remedy at law, as the secretive exclusion of parents inflicts irreparable harm by eroding trust in the parent-child relationship, depriving parents of critical information needed to fulfill their constitutional duties, and exacerbating children's vulnerability during a formative period. As demonstrated by the facts herein, all it takes is one secretive action—such as Defendant Ringlehan granting Dylan permission to socially transition at school while excluding parents—to trigger a foreseeable cascade; isolation within the home, spiraling deep depression, complete disconnect from parental guidance and emotional support, and severe undermining of the family's ability to address underlying mental health needs.

106.  The deprivation of Plaintiffs' fundamental constitutional rights constitutes irreparable injury, as the loss of parental authority over a child's health and upbringing, particularly where a child commits suicide, cannot be compensated by monetary damages. The only relief and comfort available to Plaintiffs is

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

assurance that what happened to Dylan, through the deprivation of their parental rights, will not happen to another child. The balance of equities strongly favors Plaintiffs and other similarly situated parents: enjoining the Policy imposes minimal burden on Defendants, while denying relief perpetuates Plaintiffs heartbreak and the irreparable erosion of family bonds and parental oversight. Finally, the public interests favors injunctive relief, as safeguarding fundamental parental rights to protect and guide children—particularly those at elevated suicide risk—serves the welfare of minors and society at large, outweighing any countervailing interests in student privacy that can be accommodated without blanket secrecy from parents.

## COUNT I

### 42 U.S.C. § 1983

**FOURTEENTH AMENDMENTDEPRIVATION OF PARENTAL RIGHTS – MEDICAL TREATMENT**

**(As to Defendants LAUSD, PCHS, LAUSD Board Defendants and Defendant Carvalho in their official capacities)**

107.   Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

108.   At all times referenced herein, Defendants, including their employees, were state actors or individuals acting under color of state law as public officials implementing the Secrecy Policy at PCHS, pursuant to 42 U.S.C § 1983.

109.   Plaintiffs were the biological parents and legal guardians of Dylan, and, as such, possessed Parental Rights under the Fourteenth Amendment to the United States Constitution, including the fundamental right to make medical decisions and decisions that pertained to Dylan's general welfare. These rights were not incidental; they were central to Plaintiffs' role in shaping Dylan's life and upbringing and were therefore constitutionally protected.

110.   At all times referenced herein, no court of competent jurisdiction ever

28

initiated proceedings to deem Plaintiffs unfit, to strip them of Parental Rights, or to authorize State interference with Plaintiffs' care, custody, or control of Dylan, as would be required under Cal. Welf. & Inst. Code § 300, *et seq.*

111.   Defendants' adoption and enforcement of the Secrecy Policy authorized school officials, including Mr. Smith, and Ms. Pouya, and encouraged and authorized Defendant Ringlehan to engage in gender-affirming care without parental consent, directly and indirectly interfering with Plaintiffs' constitutionally protected Parental Rights.

112.   The Secrecy Policy was the moving force behind the deprivation of Plaintiffs' fundamental Parental Rights, as it:

a.   Authorized Defendants and their employees, agents, and/or representatives and those acting in concert with Defendants to circumvent Plaintiffs' authority to provide gender-affirming care to Dylan without Plaintiffs' knowledge or consent;

b.   Authorized Defendants to provide gender-affirming care without confirming existing mental health or other medical treatment; and

c.   Allowed Defendants to engage in actions constituting medical and psychological intervention under the guise of social transition support, without regard to the treatment sought by Dylan's parents or the professional mental health care already in place.

113.   Defendants, their agents, employees, and representatives, provided Dylan with medical care, through gender-affirming care—by engaging in conduct that included:

a.   Recognizing and addressing Dylan by his assumed gender, name, and pronouns;

b.   Providing Dylan with counseling and mental health resources in connection with his transition;

29

c.    Unilaterally determining it was not in Dylan's best interests for Plaintiffs to be privy to conversations and decisions concerning Dylan and his gender transition;

d.    Unilaterally determining it was not in Dylan's best interest to continue residing with his parents while transitioning;

e.    Providing Dylan with housing resources while still a minor, in furtherance of supporting his transition; and

f.    Addressing Dylan publicly as "Aria" to his peers and community, thereby reinforcing the transition without parental involvement or consent.

114.    By engaging in the foregoing conduct, Defendants undermined and/or contradicted Plaintiffs' efforts to provide Dylan with appropriate private mental healthcare, exacerbating Dylan's psychological distress and depression, which ultimately resulted in his suicide.

115.    Defendants' conduct was undertaken deliberately and with knowledge that their actions interfered with and violated Plaintiffs' constitutional rights. Defendants usurped Plaintiffs' authority to make medical decisions for Dylan, which undermined their role as parents by substituting their judgment with that of state actors, by excluding Plaintiffs and/or ignoring Plaintiffs' express concerns about Dylan's underlying mental health issues and by failing to train staff regarding parental consent obligations.

116.    The Defendants' interference here directly implicated Plaintiffs' fundamental liberty interest protected by the Fourteenth Amendment. As established in *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 934 (3d Cir. 2011), and *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 184 (3d Cir. 2005), the parents' liberty interest is violated where the State's action "deprived them of their right to make decisions concerning their child."

30

117.   Here, Defendants' implementation of the Secrecy Policy and provision of gender-affirming treatment to Dylan without Plaintiffs' consent directly interfered with and contradicted the medical and psychological treatment course sought by Plaintiffs on behalf of their child, thereby completely depriving Plaintiffs of the right to make decisions concerning their son.

118.   As a direct and proximate result of Defendants' implementation of the Secrecy Policy and provision of gender-affirming care without Plaintiffs' knowledge or consent, and in contravention with Plaintiffs existing mental health treatment for Dylan, Plaintiffs have suffered and continue to suffer irreparable harm through the loss of their parental rights, which has a continuing impact on their family.

119.   Defendants' violation of Plaintiffs' substantive due process rights entitles them to declaratory and injunctive relief, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT II

### 42 U.S.C. § 1983

### FOURTEENTH AMENDMENT

### DEPRIVATION OF PARENTAL RIGHTS – DIRECT CARE & UPBRINGING

**(As to Defendants LAUSD, PCHS, LAUSD Board Defendants and Defendant Carvalho in their official capacities)**

120.   Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

121.   At all times referenced herein, Defendants, including their employees were state actors or individuals acting under color of state law as public officials implementing the Secrecy Policy at PCHS, pursuant to 42 U.S.C § 1983.

122.   Plaintiffs, as parents, possessed a fundamental liberty interest under the Due Process Clause of the Fourteenth Amendment to direct the care, custody, and

upbringing of their child, Dylan, including decisions regarding his education, medical and mental health treatment, and psychological well-being.

123.   At all times referenced herein, no court of competent jurisdiction ever initiated proceedings to deem Plaintiffs unfit, to strip them of Parental Rights, or to authorize State interference with Plaintiffs' care, custody, or control of Dylan, as would be required under Cal. Welf. & Inst. Code § 300, *et seq.*

124.  Defendants' adoption and enforcement of the Secrecy Policy authorized school officials within LAUSD to provide gender-affirming care to Dylan in furtherance of his social transition, without parental knowledge or consent in direct violation of Plaintiffs' fundamental rights to direct Dylan's care and upbringing.

125.   The gender-affirming care provided by Defendants included addressing Dylan by a new name and pronouns, affirming his assumed gender, offering mental health services and other resources, and actively distancing Dylan from his parents without their knowledge, consent, or any clinical determination that Dylan met the diagnostic criteria for gender dysphoria, or that such interventions were medically indicated.

126.   Defendants' actions were undertaken unilaterally and in secret without any indication that Plaintiffs were abusive, neglectful, or otherwise unfit to parent Dylan. Plaintiffs have never been accused of abuse, neglect, or unfitness to parent by any court or agency. Consequently, Defendants substituted their judgment for Plaintiffs' in matters constitutionally reserved to parents. This deliberate and secret exclusion of fit parents from decisions affecting their minor child's welfare was arbitrary and shocking.

127.   As a direct and proximate result of Defendants' implementation of the Secrecy Policy and provision of gender-affirming care without Plaintiffs' knowledge or consent, Plaintiffs have suffered and continue to suffer irreparable harm through

32

the loss of their parental right to direct the care and upbringing of Dylan which had the effect of causing severe emotional distress and eroded familial trust and the parent-child relationship, which has a continuing impact on their family.

128.   Defendants' violation of Plaintiffs' substantive due process rights entitles them to declaratory and injunctive relief, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT III

### 42 U.S.C. § 1983

### FOURTEENTH AMENDMENT

### DEPRIVATION OF PARENTAL RIGHTS – LOSS OF COMPANIONSHIP & FAMILIAL RELATIONSHIP

**(As to Defendants LAUSD, PCHS, LAUSD Board Defendants and Defendant Carvalho in their official capacities)**

129.   Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

130.   At all times referenced herein, Defendants, including their employees, were state actors or individuals acting under color of state law as public officials implementing the Secrecy Policy at PCHS, pursuant to 42 U.S.C § 1983.

131.   Plaintiffs, as parents, possess a fundamental liberty interest under the Due Process Clause of the Fourteenth Amendment to companionship, society, and familial association with their child. This constitutionally protected liberty interest encompasses both the custodial relationship during the child's minority and the enduring right to companionship and society even after the child reaches the age of majority.

132.   At all times referenced herein, no court of competent jurisdiction initiated proceedings or entered any order authorizing the State, the District, or school personnel to interfere with Plaintiffs' care, custody, or parental decision

33

1  making for Dylan. Such interference ordinarily occurs through judicial proceedings
2  under Cal. Welf. & Inst. Code § 300, *et seq*.

3      133.  Defendants' adoption and enforcement of the Secrecy Policy
4  authorized school officials within LAUSD to provide gender-affirming care to Dylan
5  without parental knowledge or consent. This directly interfered with Plaintiffs'
6  fundamental right to maintain companionship and familial relationship with Dylan
7  by undermining trust and intimacy inherent in the parent-child relationship. This was
8  done by school officials, like Ms. Pouya, Mr. Grant, and Defendant Ringlehan
9  actively encouraging Dylan's social transition and separation from his parents.

10      134.  The gender-affirming care provided by Defendants included addressing
11  Dylan by a new name and pronouns, affirming his assumed gender, offering mental
12  health services and other resources, and actively distancing Dylan from his parents
13  without their knowledge, consent, or any clinical determination that Dylan met the
14  diagnostic criteria for gender dysphoria, or that such interventions were medically
15  indicated.

16      135.  Most egregiously, Defendant Ringlehan advised Dylan that he "did not
17  need his parents' permission" and Mr. Smith provided Dylan with a link to youth
18  transitional housing for transgender youth in furtherance of separating Dylan from
19  his parents, while he was a minor. These actions were performed in secret and eroded
20  Plaintiffs ability to engage in and preserve a relationship of open communication,
21  trust, and shared-decision making with Dylan.

22      136.  Defendants' actions lacked any compelling state interest and were not
23  narrowly tailored to serve any legitimate governmental purpose. Instead,
24  Defendants' unilateral and arbitrary conduct—undertaken with deliberate
25  indifference to Plaintiffs' constitutional rights— was so egregious as to shock the
26  conscience.

27

28

34

137.    By implementing the Secrecy Policy and affirming Dylan's gender identity without involving Plaintiffs, Defendants intentionally or recklessly disrupted the familial bond between Plaintiffs and their son, causing profound estrangement and depriving Plaintiffs of the companionship and society of their child both during Dylan's minority and after he reached the age of majority. Such conduct has contributed to the ongoing deprivation of companionship and relationship with Dylan that Plaintiffs experience through the permanent loss of their son.

138.    As a direct and proximate result of Defendants' implementation of the Secrecy Policy and gender-affirming care provided to Dylan, Defendants have intentionally or recklessly disrupted the familial bond between Plaintiffs and Dylan that caused profound estrangement and deprived Plaintiffs of the companionship and society of Dylan during his minority and after he reached the age of majority. Moreover, such conduct has contributed to the ongoing deprivation of companionship and familial relationship with Dylan that Plaintiffs experience through the permanent loss of their son.

139.    Defendants' violation of Plaintiffs' substantive due process rights entitles them to declaratory and injunctive relief, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT IV

### 42 U.S.C. § 1983

### FOURTEENTH AMENDMENT

### DEPRIVATION OF PROCEDURAL DUE PROCESS RIGHTS

### (As to Defendants LAUSD, PCHS, LAUSD Board Defendants and Defendant Carvalho in their official capacities)

140.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

35

141.  At all times referenced herein, Defendants, including their employees and agents, were state actors or individuals acting under color of state law as public officials implementing the Secrecy Policy, pursuant to 42 U.S.C. § 1983.

142.  At all times referenced herein, Plaintiffs possessed Parental Rights under the Due Process Clause of the Fourteenth Amendment, including, but not limited to, the right to direct the care, custody, and upbringing of their child, Dylan, as well as the right to make medical decisions for him and to enjoy the companionship and society of Dylan. These rights are not incidental—they are fundamental and constitutionally protected as essential to the parent-child relationship and family autonomy.

143.  At all times referenced herein, no court of competent jurisdiction initiated proceedings or entered any order authorizing the State, the District, or school personnel to interfere with Plaintiffs' parental rights, or determine that their care, custody, or control was contrary to Dylan's best interests, as required under Cal. Welf. & Inst. Code § 300, *et seq*.

144.  Nevertheless, Defendants adopted and implemented the Secrecy Policy, authorizing school personnel to engage in gender-affirming care, including the use of Dylan's assumed gender identity, preferred name, and pronouns, and providing mental health counsel and resources, like the youth transitional housing Link, to facilitate Dylan's gender transition without notifying or obtaining consent from Plaintiffs—effectively stripping them of their decision making authority they would otherwise have as a component of legal custody.

145.  Under the Secrecy Policy, Defendants permitted school staff to withhold information from Plaintiffs about Dylan's asserted gender identity and related actions taken at school based on staff members' subjective assessment of "safety" or "well-being," without requiring documentation, objective criteria, or parental involvement. Plaintiffs received no notice that the Secrecy Policy was being

36

applied to Dylan and were given no process to learn of, address, or object to Defendants' actions concerning their child depriving them of their rights

146. More specifically, by adopting the Secrecy Policy and providing Dylan with gender-affirming care, Defendants deprived Plaintiffs of procedural due process under the Fourteenth Amendment when they:

    a.    Failed to provide Plaintiffs with notice of the Secrecy Policy or of its application to Dylan;

    b.    Denied Plaintiffs any opportunity to be heard or to contest the implementation of the Secrecy Policy or the appropriateness of the gender-affirming care provided to Dylan; and

    c.    Made unilateral and arbitrary decisions regarding the validity of Dylan's assumed gender identity and social transition without a medical determination of necessity, judicial oversight, or parental participation.

    d.    Usurped Plaintiffs' private interest in legal custody decision making without any determination by a court of competent jurisdiction that Plaintiffs were unfit parents or engaging in child neglect or abuse.

147. Defendants' actions lacked any compelling state interest that could justify excluding Plaintiffs from critical decisions concerning their child. The Secrecy Policy and its implementation were not narrowly tailored to serve any legitimate governmental objective. Instead, Defendants entirely bypassed parental involvement and failed to consider Dylan's ongoing mental health challenges, in violation of the strict scrutiny standard required when fundamental Parental Rights are at stake.

148. Defendants enforced the Secrecy Policy against Plaintiffs without any individualized determination that Plaintiffs were unfit or that Dylan faced abuse, neglect, or imminent harm at home. Plaintiffs were never accused of wrongdoing,

and no court or agency made any finding that Plaintiffs posed a risk to Dylan. Defendants' actions interfered with Plaintiffs' ability to protect Dylan's welfare and to participate in decisions concerning his mental health and wellbeing.

149.    Defendants acted intentionally or with deliberate indifference to Plaintiffs' constitutional rights by implementing and enforcing the Secrecy Policy in secret, without notice, procedural safeguards, or any demonstrated medical necessity for gender-affirming intervention. This conduct disregarded Plaintiffs' authority, contradicted their child's existing treatment plan, and substituted state judgment for that of fit and attentive parents.

150.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered irreparable harm, including but not limited to:

    a.    Loss of their ability to direct the care, custody, and control of Dylan, including decisions regarding his medical and psychological care and well-being;

    b.    Erosion of familial trust and the parent-child relationship; and

    c.    Severe emotional distress.

151.    Defendants' failure to provide Plaintiffs with notice, an opportunity to be heard, or an impartial review prior to interfering with their fundamental Parental Rights violated the procedural due process guarantees of the Fourteenth Amendment. By concealing their actions under the Secrecy Policy and excluding Plaintiffs from critical decisions concerning their son's welfare, Defendants deprived Plaintiffs of the procedural safeguards that form the foundation of constitutional due process. As a direct result, Plaintiffs were denied any opportunity to protect Dylan's well-being, to participate in decisions concerning his care, and to exercise their constitutionally protected parental authority—all culminating in irreversible harm and loss.

152.    As a direct and proximate cause of Defendants' deprivation of

Plaintiffs' procedural due process rights, Plaintiffs have been deprived of their rights to direct the medical treatment, care, custody, control of Dylan, and companionship and familiar relationship, entitling them to declaratory and injunctive relief, reasonable attorneys' fees and costs, and any other and further relief this Court deems just and proper.

## COUNT V

### DEPRIVATION OF PARENTAL RIGHTS UNDER 42 U.S.C. § 1983
### (Against Defendant Ringlehan in his Individual Capacity)

153.   Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

154.   At all times relevant to this Complaint, Defendant Ringlehan was, upon information and belief, employed by Defendant LAUSD as a psychiatric social worker. Alternatively, Defendant Ringlehan was not an employee of the LAUSD during the operative time but was acting as a private citizen in concert with government officials to violate Plaintiffs constitutional rights (*see* Count VI).

155.   At all times relevant hereto, Defendant Ringlehan acted under the color of state law within the meaning of 42 U.S.C § 1983 by virtue of his employment with LAUSD.

156.   The Fourteenth Amendment to the U.S. Constitution protects the fundamental liberty interest of parents in the care, custody, and control of their children. This substantive due process right includes the right to direct the upbringing, education, and medical care for their minor children, and to receive information material to decisions concerning their child's welfare.

157.   At all relevant times, Plaintiffs were the parents and legal guardians of Dylan, a minor student enrolled at PCHS.

158.   Defendant Ringlehan knew or reasonably should have known that Plaintiffs had not been informed of, and had not consented to, the provision of his

mental health care for Dylan.

159.   Defendant Ringlehan intentionally concealed and/or participated in the Secrecy Policy or practice of concealing the nature and existence of his mental health services from Plaintiffs.

160.   Defendant Ringlehan's conduct in providing mental health services to Dylan concerning his social transition, without his parent's knowledge or consent, and in concealing the existence and nature of such services from Plaintiffs, constitutes a violation of Plaintiffs' fundamental constitutional right to direct the care, custody, upbringing, and medical treatment of their minor child.

161.   Defendant Ringlehan's actions were undertaken intentionally, willfully, and with deliberate indifference to Plaintiffs' clearly established constitutional rights, as demonstrated, in part, by his express statement to Dylan saying "*you don't need your parent's permission*" (emphasis added).

162.   No purported compelling governmental interest justified the infringement of these fundamental parental rights, nor were Defendant Ringlehan's actions narrowly tailored to serve such interest.

163.   As a direct and proximate result of Defendant Ringlehan's unconstitutional conduct, Plaintiffs have suffered and continue to suffer damages, including but not limited to interference with the parent-child relationship, entitling them to declaratory and injunctive relief, compensatory, nominal, and punitive damages, reasonable attorneys' fees and costs, and any other and further relief that this Court deem just and appropriate.

## COUNT VI
### 42 U.S.C. § 1983
### CONSPIRACY TO VIOLATE CIVIL RIGHTS
### (Against Defendant Ringlehan in his Individual Capacity)

164.   Plaintiffs repeat, reiterate, and reallege each and every allegation set

40

forth in the preceding paragraphs as though fully set forth herein.

165.   Plaintiffs have a reasonable belief that Defendant Ringlehan did not work for the LAUSD during relevant timeframe, but rather acted as a private citizen. Specifically, PCHS Board Meeting Minutes from September 22, 2020 states that Defendant Ringlehan retired "last year." A true and correct copy of excerpts from the September 22, 2020 meeting minutes are attached hereto as **Exhibit 5**. Defendant Ringlehan's involvement with Dylan began in Spring of 2020.

166.   At all times relevant to this Complaint, Plaintiffs possessed clearly established fundamental rights under the Fourteenth Amendment of the U.S. Constitution, including but not limited to:

    a.   The fundamental right to direct the care, custody, and upbringing of their child;

    b.   The fundamental right to make decisions regarding the medical care of their child;

    c.   The fundamental right to companionship and familial relationship; and

    d.   The right to be free from governmental interference with these fundamental rights.

167.   Defendant Ringlehan, acting under the color of state law, reached an express and/or implied agreement and understanding with Defendants and other state actors, to deprive Plaintiffs of their clearly established constitutional rights through the adoption and implementation of the Secrecy Policy.

168.   More specifically, in Spring 2020, Defendant Ringlehan acting in concert and explicit or implicit agreement with Ms. Pouya, and upon information and belief, other PCHS and/or LAUSD officials and/or external resources, worked together for the purpose of facilitating and/or supporting Dylan's social gender transition.

169.   In furtherance thereof, Defendant Ringlehan and his co-conspirators

41

committed overt acts, including, but not limited to meeting with Dylan in secret and providing unauthorized mental health treatment, including, counseling, referring to Dylan by his new name and pronouns, and other supportive gender-affirming care.

170.   In doing so Defendant Ringlehan advised Dylan he did not need his parents' permission, to conceal Defendant Ringlehan's conduct and that of his co-conspirators from Plaintiffs, deliberately excluding Plaintiffs and depriving them of their well-established parental rights to make decisions pertaining to Dylan's medical care and wellbeing.

171.   The fact that Defendant Ringlehan's conduct and that of his co-conspirators was committed in secret is indicative of a deliberate effort to undermine Plaintiffs' well-established parental rights. Defendant Ringlehan willfully participated in this conspiracy with Defendants and other state actors.

172.   The purpose and effect of the conspiracy was to deprive Plaintiffs of their fundamental parental rights by excluding them from Dylan's mental health treatment, undermining their chosen course of care, and ultimately contributing to the circumstances leading to Dylan's death.

173.   Defendant Ringlehan's conduct was willful, wanton, intentional, and undertaken with deliberate indifference to Plaintiffs' constitutional rights as demonstrated, in part, by his express statement to Dylan saying "*you don't need your parent's permission*" (emphasis added).

174.   A reasonable social worker in Defendant Ringlehan's position would have known that providing gender-affirming care, in secret and without parental consent, violated Plaintiffs' clearly established constitutional rights.

175.   As the direct and proximate result of the conspiracy and Defendant Ringlehan's actions in furtherance thereof, Plaintiffs have suffered and continue to suffer from the deprivation of their constitutional rights to direct Dylan's medical treatment, care, custody and control, and companionship and familial relationship,

42

causing severe emotional distress, mental anguish, grief and psychological harm, entitling Plaintiffs to declaratory and injunctive relief, compensatory, nominal, and punitive damages in an amount sufficient to punish Defendant Ringlehan and deter similar conduct in the future, reasonable attorneys' fees and costs, and any other and further relief this Court deems just and proper.

## COUNT VII

### VIOLATION OF THE CALIFORNIA PUBLIC RECORDS ACT –
### FAILURE TO RESPOND
### (Against Defendant PCHS)

176.   Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

177.   Defendant PCHS is a California charter school authorized pursuant to Cal. Ed. Code § 47600 et seq. and thus constitutes a public agency subject to the requirements of California Public Records Act ("**CPRA**"). Pursuant to Education Code § 47604.1, charter schools are expressly required to comply with the CPRA, which mandates that public records be made *promptly* available to any member of the public upon request, except if exempted by law. (*See*, Cal. Gov. Code § 7922.530).

178.   At all relevant times, Defendant PCHS acted as a public agency within the meaning of the CPRA and exercised authority delegated by the State of California.

179.   On or about March 5, 2025, Plaintiffs, through their counsel, submitted written records requests to PCHS pursuant to the CPRA, seeking access to:

a.   Any and all Charter(s) and/or Mission Statement(s) of the Transgender Alliance Club and/or Transgender Awareness Club from January 1, 2019 through December 31, 2022;

b.   All correspondence, including but not limited to emails and Schoology

43

messages sent and/or received by any Palisades Charter High School employees to and/or from Dylan/Aria Parke from January 1, 2019 through December 31, 2022;

c.    All records (including but not limited to emails, texts, handwritten notes, memoranda, meeting minutes, video/audio recordings, etc.) concerning any and all meetings between Palisades Charter High School staff and Dylan/Aria Parke from January 1, 2019 through December 31, 2022;

d.    All records (including but not limited to emails, texts, handwritten notes, memoranda, meeting minutes, video/audio recordings, etc.) between Palisades Charter High School staff concerning Dylan/Aria Parke from January 1, 2019 through the date of the search;

e.    All records concerning any Palisades Charter High School internal guidance and/or policies concerning the treatment/handling of LGBTQ students, particularly those students questioning or actively undergoing gender transitioning in effect from January 1, 2019 through the date of the search;

f.    All correspondence, including but not limited to emails and Schoology messages sent and/or received by Elva Pouya to and/or from Dylan Parke from January 1, 2019 through March 1, 2024;

g.    All records (including but not limited to presentations, audio/video recordings, handouts, notes, slides, charts, etc.) concerning all continued learning and/or professional development seminars given to staff and/or administration concerning transgender and/or LGBTQ issues form January 1, 2019 through December 31, 2022;

h.    All records (including but not limited to communications, memoranda, meeting minutes, emails, texts, handwritten notes, video/audio

44

recordings, etc.) concerning any investigation conducted in response to the March 6, 2023 letter from Foundation Against Intolerance & Racism to Pamela Magee;

i.    All Schoology communications for Transgender Alliance Club or Transgender Awareness Club concerning or relating to Dylan/Aria Parke from January 1, 2019 to December 31, 2022;

j.    All records (including but not limited to electronically stored and handwritten notes, memoranda, emails, meeting minutes and files) concerning 504 and/or IEP for Dylan Aria Parke from January 1, 2019 through the date of the search;

k.    All correspondence, including but not limited to emails and Schoology messages, sent and/or received by Joe Ringlehan to and/or from Dylan/Aria Parke from January 1, 2019 through March 1, 2024; and

l.    All correspondence, including but not limited to emails and Schoology messages sent and/or received by Grant Smith to and/or from Dylan/Aria Parke from January 1, 2019 through March 1, 2024 (collectively referred to herein as "**Outstanding Requests**").

180.   The foregoing Outstanding Requests were all submitted with a corresponding Declaration of Plaintiff Mulligan authorizing the release of records to her counsel pertaining to her child, Dylan Parke.

181.   Pursuant to Cal. Gov. Code § 7922.535, Defendant was required to determine whether the request, in whole or in part, seeks disclosable public records and to notify Plaintiffs of such determination within ten (10) days of receipt of the request, or within fourteen (14) days under unusual circumstances as specified therein.

182.   Defendant PCHS received Plaintiffs' public records requests but failed to provide any response within the statutory time period required. Defendant failed

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

to make a determination within ten (10) days of receipt of Plaintiffs' CPRA request, failed to invoke any lawful extension, and failed to produce any responsive records, in direct violation of California Government Code §§ 7922.535 and 7922.540.

183.    On May 28, 2025, Plaintiffs sought confirmation of receipt of the Outstanding Requests and was told "[t]hey have been forwarded to the appropriate staff members."

184.    Despite this acknowledgement of receipt, no responses were provided, prompting Plaintiffs to follow up on the status of the Outstanding Requests on July 22, 2025, to which no response was provided.

185.    In a good faith attempt to ascertain the status of the Outstanding Requests, Plaintiffs, on August 28, 2025, again inquired into the status and once again, no response was provided. To date, as of February 2026, no responses have been provided to the Outstanding Requests.

186.    Defendant PCHS's failure to respond to Plaintiffs' Outstanding Requests constitutes violations of the CPRA, specifically California Government Code §§ 7922.530 and 7922.535, and Education Code § 47604.1, which require a timely determination and response to public records requests by charter schools.

187.    Defendant PCHS's failure to comply with the CPRA have denied Plaintiffs access to public records to which Plaintiffs are entitled, thereby frustrating Plaintiffs' ability to investigate PCHS's conduct/influence on their son, Dylan, in connection with their Parental Rights set forth in this Complaint.

188.    Plaintiff has no remedy at law to compel PCHS' compliance with the CPR other than through an order obtained through this action. (*See* Cal. Gov. Code § 7923.000).

189.    Plaintiffs are entitled to recover their costs and reasonable attorney's fees pursuant to Cal. Gov. Code § 7923.115.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray that this Honorable Court enter judgment in their favor and against Defendants, and grant the following relief:

I.     A declaration that Defendants' conduct, as alleged herein, violated Plaintiffs' substantive due process rights under the Fourteenth Amendment of the U.S. Constitution, including their fundamental rights to direct the medical treatment, care, upbringing, and companionship of their child;

II.    A declaration that Defendants' conduct, as alleged herein, violated Plaintiffs' procedural due process rights under the Fourteenth Amendment to the United States Constitution;

III.   A declaration that Defendant PCHS violated the California Public Records Act by failing to respond to Plaintiffs' public records request;

IV.   Because the constitutional violations alleged are capable of repetition but likely to evade review, permanent injunction enjoining Defendants from continuing to violate the constitutional rights of California parents, as alleged herein;

V.     An order compelling Defendant PCHS to comply with the California Public Records Act and produce all outstanding responsive records;

VI.   Award compensatory damages against Defendant Ringlehan in his individual capacity in an amount to be determined at trial or in the alternative nominal damages;

VII.   Award punitive damages against Defendant Ringlehan in his individual capacity in an amount sufficient to punish and deter such conduct in the future;

VIII. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

47

1    IX.    Award reasonable attorneys' fees and costs pursuant to California

2           Government Code § 6259; and

3    X.     Award such other and further relief that this Court deems just and

4           proper.

5

6    Dated: February 27, 2026                    Respectfully submitted by,

7                                                By: */s/ Julianne Fleischer*

8                                                ADVOCATES FOR FAITH

9                                                & FREEDOM
                                                 Robert H. Tyler (SBN 179572)
10                                               btyler@faith-freedom.com

11                                               Julianne Fleischer (SBN 337006)
                                                 jfleischer@faith-freedom.com
12                                               25026 Las Brisas Road

13                                               Murrieta, California 92562
                                                 Telephone: (951) 304-7583
14

15                                               SIRI & GLIMSTAD LLP
                                                 Aaron Siri (*pro hac vice filed*
16                                               *concurrently*)

17                                               aaron@sirillp.com
                                                 Marina Resciniti (*pro hac vice filed*
18                                               *concurrently*)

19                                               mresciniti@sirillp.com
                                                 745 Fifth Avenue, Suite 500
20                                               New York, NY 10151

21                                               Telephone: 888-747-4529

22                                               SIRI & GLIMSTAD LLP
                                                 Erin Bello (SBN 270783)
23                                               ebello@sirillp.com

24                                               700 S. Flower Street, Suite 1000
                                                 Los Angeles, CA 90017
25                                               Telephone: 888-747-4529

26                                               *Attorneys for Plaintiffs*

27

28

                                           48
                ─────────────────────────────────────────────