Exhibit "A"



Sloan R. Simmons
*Attorney at Law*

E-mail: ssimmons@lozanosmith.com

Erin M. Hamor
*Attorney at Law*

E-mail: ehamor@lozanosmith.com

April 7, 2026

**By U.S. Mail & E-Mail:** ebello@sirillp.com; aaron@sirillp.com; mresciniti@sirillp.com;
btyler@faith-freedom.com; jfleischer@faith-freedom.com

Erin Bello
Aaron Siri
Marina Resciniti
Siri & Glimstad LLP
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017

Robert H. Tyler
Julianne Fleischer
Advocates For Faith & Freedom
25026 Las Brisas Road
Murrieta, CA  92562

Re:    Meet and Confer re: Motion to Dismiss – *Kathleen Mulligan et al. v. LAUSD et al.*;
United States District Court, Central District, Case 2:26-cv-02133-CBM-JDE

Dear Ms. Bello and All:

On behalf of Defendants Los Angeles Unified School District ("LAUSD"), Superintendent
Alberto Carvalho ("Superintendent"), LAUSD Board of Education ("Board") Member Scott
Schmerelson, Board Member Nick Melvoin, Board Member Kelly Gonez, Board Member Rocio
Rivas, Board Member Sherlett Hendy Newbill, Board Member Karla Griego, Board Member
Tanya Ortiz Franklin, and former LAUSD employee Joseph Ringlehan, in his individual capacity
(collectively, "LAUSD Defendants"), we write to meet and confer in advance of filing a Motion
to Dismiss under Federal Rules of Civil Procedure, Rules 12(b)(1) and 12(b)(6), requesting
dismissal of the Complaint filed by Kathleen Mulligan and Andrew Parke ("Plaintiffs") in the
above-referenced case.

Plaintiffs allege the following claims against LAUSD, the LAUSD Board Defendants, and
Superintendent Carvalho: (Count I) 42 U.S.C. § 1983: Fourteenth Amendment Deprivation of
Parental Rights – Medical Treatment; (Count II) 42 U.S.C. § 1983: Fourteenth Amendment
Deprivation of Parental Rights – Direct Care & Upbringing; (Count III) 42 U.S.C. § 1983:
Fourteenth Amendment Deprivation of Parental Rights – Loss of Companionship & Familial

*Limited Liability Partnership*

*400 Capitol Mall, Suite 2200 Sacramento, California 95814  Tel 916-329-7433  Fax 916-329-9050*

Ms. Erin Bello
April 7, 2026
Page 2

Relationship; and (Count IV) 42 U.S.C. § 1983: Fourteenth Amendment Deprivation of Procedural Due Process Rights.  Plaintiffs allege the following claims against Mr. Ringlehan, in his individual capacity: (Count V) Deprivation of Parental Rights Under 42 U.S.C. § 1983; and (Count VI) 42 U.S.C. § 1983: Conspiracy to Violate Civil Rights.  However, Plaintiffs lack standing, fail to allege sufficient facts to allege valid claims against all LAUSD Defendants, and likewise fail to address qualified immunity principles applicable to Mr. Ringlehan, as discussed below.

**1.      Lack of Standing under FRCP, Rule 12(b)(1), as Against LAUSD, LAUSD Board Defendants, and Superintendent Carvalho.**

A party asserting federal jurisdiction has the burden of pleading and proving a federal court has subject matter jurisdiction over a dispute.  *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377 (1994).  Because subject matter jurisdiction involves a court's power to hear a case, it can never be forfeited or waived.  *United States v. Cotton*, 535 U.S. 625, 630 (2002).  Lack of subject matter jurisdiction may be raised through a motion to dismiss under Rule 12(b)(1).  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).  The United States Constitution, Article III, section 2, ("Article III"), grants federal courts jurisdiction to hear only "cases" or "controversies."  "'[I]t is well settled that federal courts may act only in the context of a justiciable case or controversy.'"  *Sec. & Exch. Comm'n v. Med. Comm. for Human Rights,* 404 U.S. 403, 407 (1972).  Article III standing is mandatory and not subject to waiver.  *U.S. v. Hays*, 515 U.S. 737, 742 (1995).

To establish Article III standing, a plaintiff must demonstrate, among other requirements, that "the injury is fairly traceable to the challenged action of the defendant."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–181 (2000); *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009).  The burden falls squarely on a plaintiff to establish the requisite elements supporting Article III standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  A plaintiff who fails to meet this burden is jurisdictionally barred from litigating in federal court.  *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475-476 (1982).  The Complaint does not plead facts supporting this requisite nexus for Article III standing.

As to LAUSD, the LAUSD Defendants, and Superintendent Carvalho, the Complaint alleges said Defendants' liability arises from LAUSD's Policy Bulletin BUL-6224.2, "Gender Identity and Students – Ensuring Equity and Nondiscrimination," which the Complaint has dubbed the "Secrecy Policy."  Compl., Ex. 1; see, e.g., ¶ 3.  However, in attempting to draw this connection, the Complaint overlooks that Plaintiffs' child, Dylan Parke, was a student of the Palisades Charter High School ("Charter School" or "Palisades Charter"), a local educational agency separate and distinct from LAUSD, direct funded by the State of California, and operated as or by its California nonprofit public benefit corporation.  *See*, e.g., Ed. Code, § 47604.  As stated in the Charter School's petition, Palisades Charter: "As an independent charter school, Charter School, operated as or by its nonprofit public benefit corporation, is a separate legal entity and shall be solely responsible for the debts and obligations of Charter School."  Pet., Element 4, Governance; *see* Ed. Code, § 47604, subd. (d).  While LAUSD is Palisades Charter's authorizer, this does not impact the operational independence of the Charter School.  As a separate entity, Palisades Charter develops and maintains its own policies applicable to its operations, including

Ms. Erin Bello
April 7, 2026
Page 3

students, and apart from those LAUSD policies relating to charter schools, LAUSD policies are inapplicable to Palisades Charter.  As such, while Plaintiffs have identified LAUSD "policies and practices" as allegedly impacting their child detrimentally, no "policy or practice" identified in the Complaint is fairly traceable to an actual LAUSD policy or practice applicable to Palisades Charter, as an independent charter school.  Article III standing is thus lacking as to all claims against LAUSD, Board Defendants, and Superintendent Carvalho, since the alleged injury is not "fairly traceable to the challenged action of the defendant." *Friends of the Earth, Inc.*, 528 U.S. at 180–181.

**2.**     **Failure to State a Claim under FRCP, Rule 12(b)(6), as to Counts V and VI Against Joseph Ringlehan in His Individual Capacity:  Mr. Ringlehan is entitled to Qualified Immunity Because the Facts Alleged in the Complaint Do Not and Cannot Establish Violation of Clearly Established Constitutional Rights, nor that Mr. Ringlehan Could Have Reasonably Believed His Actions Constituted a Violation of Any Constitutional Right.**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982); *see Brewster v. Bd. of Educ.*, 149 F.3d 971, 977 (9th Cir. 1998).  "[Q]ualified immunity [thus] . . . ensure[s] that defendants 'reasonably can anticipate when their conduct may give rise to liability' . . . by attaching liability only if '[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right[.]'" *United States v. Lanier*, 520 U.S. 259, 270, 117 S.Ct. 1219 (1997).  Correspondingly, before being held liable, "public officials must be given clear notice that their conduct is unlawful." *Brewster*, 149 F.3d at 977.

In this regard, the Supreme Court has set forth a two-part test for qualified immunity.  Courts must decide whether facts alleged show an official's conduct violated a Constitutional right and then ask whether that right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001); *see Sandoval v. Las Vegas Metro. Police Dept.*, 756 F.3d 1154, 1160 (9th Cir. 2014).  "Whether the defendants violated a constitutional right and whether the right was clearly established ***at the time of the violation*** are questions of law." *Sandoval*, 756 F.3d at 1160 (citing *Serrano v. Francis*, 345 F.3d 1071, 1080 (9th Cir. 2003) (emphasis added).  As the Supreme Court recently explained in *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 139 S.Ct. 500, 503 (2019), the clearly established right at issue must be defined with specificity, particularized, and without generalization.  The Supreme Court explained that it contravenes settled principles of qualified immunity if the purportedly clearly established right is framed at a high level of generality, such as the "right to be free from excessive force."  Rather, review of whether there is a clearly established right must hinge upon the "particular circumstances" alleged to have amounted to a constitutional violation.  *Id*.  While there does not need to be a case directly on point, existing precedent *must* place the lawfulness of the particular action "beyond debate." *Id.* at 504; *see Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508 (2002); *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987) (for qualified immunity not to apply "in the light of pre-existing law[,] the unlawfulness must be apparent."); *Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir. 1990) (where law unsettled, law not clearly established, qualified immunity applies); *Manhattan Beach Police Officers Ass'n, Inc. v. City of Manhattan Beach*, 881 F.2d 816, 818 (9th

Ms. Erin Bello
April 7, 2026
Page 4

Cir. 1989) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . ."). Under this framework, qualified immunity "provides a protection to government officers that is quite far-reaching." *Brewster*, 149 F.3d at 977.

Here, the Complaint alleges, for example: "Defendant Ringlehan's conduct in providing mental health services to Dylan concerning his social transition, without his parent's knowledge or consent, and in concealing the existence and nature of such services from Plaintiffs, constitutes a violation of Plaintiffs' fundamental constitutional right to direct the care, custody, upbringing, and medical treatment of their minor child." Compl. ¶ 160. The Complaint further alleges Mr. Ringlehan "…committed overt acts, including, but not limited to meeting with Dylan in secret and providing unauthorized mental health treatment, including, counseling, referring to Dylan by his new name and pronouns, and other supportive gender-affirming care." Compl. ¶ 169. However, the Complaint does not establish any Constitutional right that was clearly established in or about the Spring of 2020, nor that Mr. Ringlehan would have been on notice of any such Constitutional right that his conduct might have violated.

Rather, the law underpinning Plaintiffs' Complaint, specifically as to schools' and school employees' role related to gender identity practices, was anything *but* well-defined in 2020, and in the years thereafter, particularly in California. By way of summary:

- In 2013, the California Legislature passed Assembly Bill (AB) 1266, permitting students to use school facilities and participate in programs and activities consistent with their gender identity. Shortly after, the California Department of Education ("CDE") published Frequently Asked Questions (FAQs) regarding AB 1266. FAQ Number 7 states: "[S]chools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family. With rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents." Following the passage of AB 1266 and CDE's publication of the FAQs, many school districts throughout California adopted policies consistent with FAQ Number 7.

- On July 10, 2023, a federal district court granted Chico Unified School District's motion to dismiss a challenge to its Administrative Regulation (AR) 5145.3, which provided that staff may only disclose a student's transgender or gender non-conforming status with the student's consent. *Regino v. Staley* (E.D. Cal. July 11, 2023) No. 2:23cv00032, 2023 WL 4464845 ("Regino"). In this matter, the plaintiff parent, who dubbed AR 5145.3 the "Parental Secrecy Policy," alleged that the district kept her child's transgender status from her. The parent also alleged that the district had "socially transitioned" her child without parental consent by using the student's preferred pronouns and name at school. The parent brought substantive due process, procedural due process, and First Amendment claims. The court dismissed each claim, finding that the parent failed to establish that she had a constitutionally protected liberty interest in receiving notice from the district of her child's gender identity or in consenting to her child's use of a certain name and pronouns at school. The parent has filed an appeal, and the case remains pending in the Ninth Circuit.

Ms. Erin Bello
April 7, 2026
Page 5

- In a similar case against another California school district, also brought in a federal district court, a parent plaintiff alleged that two teachers began an LGBTQ+ student group and held meetings during lunch without keeping records in order to conceal student involvement from their parents.  *See Konen v. Spreckels Union School Dist.* (N.D. Cal. 2022) No. 5:22cv05195, ("Konen").  The parent also alleged that the teachers convinced her child to transition, to use male pronouns, and to keep the information from the parent.  The district argued that the student voluntarily attended the lunchtime meetings, such meetings were held without record-keeping in the interest of student privacy, and the student expressed concern about disclosing their gender identity to their parent.  In its defense, the district cited its compliance with the CDE FAQs.

- In February 2025, in *Foote et al. v. Ludlow School Committee et al.,* the U.S. Court of Appeals for the First Circuit, No. 23-1069, affirmed the District Court's ruling dismissing parents' complaint regarding the school's protocol for gender identity issues, holding the parents failed to state a plausible claim that the school's protocol violated their fundamental parental rights.  Although this ruling was appealed, the Petition for Writ of Certiorari clearly articulates a circuit split and lack of clarity on gender identity and parental rights issues.

- In December 2025 in *Mirabelli v. Bonta* (S.D. Cal. September 14, 2023) No. 3:23cv00768, 2023 WL 5976992 ("Mirabelli"), the U.S. District Court, Southern District of California, granted summary judgment in a class action and issued a permanent injunction barring various actions related to student gender identity at school.   The California Attorney General, State Superintendent of Public Instruction, and State Board of Education ("State Defendants") appealed and obtained a stay of the permanent injunction from the Ninth Circuit in January 2026.  On March 2, 2026, the United States Supreme Court vacated the Ninth Circuit's stay as to the injunctive relief awarded to the parent class members (but not school employee class members).  Various aspects of this case remain ongoing in the Ninth Circuit.

In sum, the law governing schools' and school employees' obligations regarding student gender identity, parental notification, and social transition was far from clearly established in the Spring of 2020.  The Complaint fails because it does not and cannot show that any such right was clearly established in the specific factual context at issue here.  To the contrary, the authorities and circumstances referenced above as exemplars demonstrate that, at the relevant time, the law concerning these issues was unsettled, evolving, and the subject of substantial legal dispute.  Indeed, California guidance in place at the time supported maintaining the confidentiality of a student's transgender status under at least some circumstances, and subsequent litigation has only confirmed that these issues remained the subject of active disagreement among courts.

Under these circumstances, it cannot plausibly be alleged that Mr. Ringlehan had "clear notice" that the conduct attributed to him violated a Constitutional right that was defined with the requisite specificity, nor that the unlawfulness of his actions was "beyond debate."  Because the Complaint fails to allege facts establishing the violation of a clearly established Constitutional right, Counts V and VI against Mr. Ringlehan in his individual capacity are barred by qualified immunity and should be dismissed.

Ms. Erin Bello
April 7, 2026
Page 6

**3.      Failure to State a Claim under FRCP, Rule 12(b)(6), as to all Counts against
         LAUSD, LAUSD Board Defendants, and Superintendent Carvalho.**

The Complaint appears to rely largely, if not entirely, upon a policy nexus between LAUSD and
Palisades Charter, relative to the "Secrecy Policy," and any practices allegedly flowing from it.
As explained above, such nexus does not exist, because Palisades Charter is an independent
nonprofit public benefit corporation, and a local educational agency separate and apart from
LAUSD.  Apart from charter-specific policies, LAUSD's policies for its own schools and district
students do not apply to Palisades Charter or any of LAUSD's independently operated charter
schools.

In California, charter schools must comply with their own charter, policies, and laws applicable
to charter schools, but are otherwise exempt from the Education Code and related laws
governing schools.  *See* Ed. Code, § 47610.  Charter schools may further elect to be operated by,
or as, a nonprofit public benefit corporation.  *See* Ed. Code, § 47604, subd. (a).  If so, that charter
school receives its funding directly from the State of California and is operationally and
financially independent from its authorizing educational agency.  Such schools are typically
referred to as "independent" charter schools.  A chartering authority that grants a charter to a
school operated as or by a nonprofit public benefit corporation is not liable for the debts or
obligations of the charter school, if the chartering authority has complied with its oversight
obligations under the Education Code.  Ed. Code, § 47604, subd. (d).  The LAUSD Federal,
State, and District Required Language for independent charter schools contemplate this
operational separation.  *See*
https://media.edlio.net/1c5baf86/5f223c97/a83d220b/3b2a768b92ad4717a49292a66b6bef3a?_=
Federal_State_and_District_Required_Language_Rev_Nov_2024.docx.

This operational distinction is evident in the Palisades Charter petition.  For example, its Element
4, Governance, provides an organizational chart reflecting that all educational, financial, and
operational decisions roll up under the Palisades Charter Board of Trustees.  LAUSD plays no
role in governance of the Charter School.  The petition reads, in part:  "The Board of Trustees
remains directly responsible for setting PCHS's overall goals, priorities, and major policies."
Element 4, Governance.   Indeed, under its charter Petition, LAUSD plays no role whatsoever in
the operation or policies of the Charter School, apart from its role as charter authorizer.

This is dispositive to the theories underpinning the Complaint.  Plaintiffs cannot state a claim
against LAUSD, under 42 USC section 1983 or otherwise, for liability flowing from one or more
policies inapplicable to a separate and distinct educational agency and nonprofit corporation, the
Charter School; the facts as alleged do not support section 1983 claims.  Put another way,
Plaintiffs have not alleged facts giving rise to a cognizable legal theory that LAUSD, nor any
LAUSD Defendant, is liable under the policy or practices identified, nor facts supporting that
said policy even applies to the Charter School.  As such, the Complaint is vulnerable to
dismissal.

Ms. Erin Bello
April 7, 2026
Page 7

4.      **Failure to State a Claim under FRCP, Rule 12(b)(6), as to Counts V and VI against Mr. Ringlehan; Alleged Facts Do Not Support Conspiracy, Nor Section 1983 Claims.**

To establish a claim under section 1983, a plaintiff must prove the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48. Additionally, a section 1983 plaintiff must prove the personal involvement of a defendant in causing the plaintiff's injuries. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677. Further, to support a conspiracy relative to a section 1983 claim, a plaintiff must show "a combination of two or more persons who, by some concerted action, intend[ed] to accomplish some unlawful objective for the purpose of harming another which results in damage." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856-57 (9th Cir. 1999). Conspiracy is not itself a constitutional tort under section 1983. *See Cassettari v. Nev. Cnty.*, 824 F.2d 735, 739 (9th Cir. 1987) ("The insufficiency of these allegations to support a section 1983 violation precludes a conspiracy claim predicated upon the same allegations."); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) ("[M]ere proof of a conspiracy is insufficient to establish a section 1983 claim.") Conspiracy in section 1983 actions is often alleged by plaintiffs in an attempt to draw in otherwise tenuously connected parties in a complex case, *see Gilbrook*, 177 F.3d at 856-58.

Plaintiffs cannot establish the requisite elements of a section 1983 claim against Mr. Ringlehan, nor an adjacent conspiracy claim; among other issues, there are insufficient facts alleging Mr. Ringlehan engaged in any conduct depriving Plaintiffs or their child of a right secured by the Constitution and the laws of the United States. As noted above, in Section 1, the law relative to gender equity and school policies was far from well-defined during the time in question, in or about 2020. Even were it not, the facts fail to demonstrate Mr. Ringlehan engaged in any wrongdoing, much less in concert with a government actor. The Complaint alleges, for example, that a "reasonable social worker in Defendant Ringlehan's position would have known that providing gender-affirming care, in secret and without parental consent, violated Plaintiffs' clearly established constitutional rights." Compl. ¶ 174. The Complaint further alleges Mr. Ringlehan "intentionally concealed and/or participated in the Secrecy Policy or practice of concealing the nature and existence of his mental health services from Plaintiffs." Compl. ¶ 159. However, there are no facts alleged to support said intentional concealment, nor that Mr. Ringlehan's alleged conduct with Plaintiffs' child violated a "clearly identified" Constitutional right. These deficiencies similarly apply to Plaintiffs' conspiracy theory claim, which is unsupported by the facts or law. For these reasons too, the Complaint is vulnerable to dismissal.

Ms. Erin Bello
April 7, 2026
Page 8

## Meet and Confer

I look forward to further discussing this matter at our meet and confer call scheduled for April 7, 2026, at 1:00 p.m.

Sincerely,

LOZANO SMITH

Erin M. Hamor

EMH/eh